SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-04-0405-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2003-005315 |
| LEROY DEAN McGILL, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Frank T. Galati, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                Phoenix
     By    Kent E. Cattani, Chief Counsel
           Capital Litigation Section
           Jim D. Nielsen, Assistant Attorney General
Attorneys for the State of Arizona

SUSAN M. SHERWIN, MARICOPA COUNTY LEGAL ADVOCATE        Phoenix
     By    Thomas J. Dennis, Deputy Legal Advocate
Attorneys for Leroy Dean McGill
_____

**M c G R E G O R**, Chief Justice

¶1      On November 10, 2004, a jury sentenced Leroy McGill to death for the murder of Charles Perez.  Pursuant to Arizona Rule of Criminal Procedure 31.2(b), McGill's appeal to this Court is automatic.  This Court has jurisdiction pursuant to Article 6, Section 5.3 of the Arizona Constitution, and section 13-4031 (2001) of the Arizona Revised Statutes.

¶2      In July 2002, thirty-nine-year-old Leroy McGill was living in Sophia Barnhart's house.  His girlfriend, Jonna "Angel" Hardesty, also lived there, as did Justin Johnson and Barnhart's oldest son, Dean.  Jack Yates had a small one-bedroom apartment in a duplex within walking distance of Barnhart's home.  Hardesty's brother, Jeff Uhl, sometimes stayed in Yates' apartment.  Eddie and Kim Keith, along with their two daughters, also stayed with Yates, as did Charles Perez and his girlfriend, Nova Banta.  Yates had his own bedroom, and the others slept in a common room that also served as kitchen and living room.

¶3      Perez and Banta had recently accused McGill and Hardesty of stealing a shotgun from the Yates apartment.  This accusation exacerbated an already contentious relationship between Banta and Hardesty.

¶4      On July 12, 2002, McGill, Hardesty, Barnhart, and Johnson spent the evening at Barnhart's house smoking marijuana purchased from Perez.  At approximately 3:30 a.m. on July 13, McGill went to Yates' apartment.  Uhl and Eddie Keith came out of the apartment to talk with McGill.  McGill told Keith to get his wife and children out of the apartment because he "was going to teach [Perez] and [Yates] a lesson, that nobody gets away with talking about [McGill and Hardesty]."  In response to

Keith's pleading, McGill agreed to spare Yates, but said it was too late for Perez. McGill also told Keith that he "was the only one who knew about it and that if anybody said anything about it, that [McGill] would know who said it," then remarked that Keith "had pretty little girls." Keith and his family fled the apartment.

¶5 Uhl admitted McGill into the apartment shortly thereafter. Perez and Banta were sitting next to each other on a couch that was next to the front door. Yates was also inside and either lying down on another couch or in his bedroom. Banta testified that McGill "turned around and looked at me and [Perez] and said [Perez] shouldn't talk behind other people's backs, and he poured the gasoline on us and quickly lit a match and threw it at us." McGill had added pieces of a styrofoam cup to the gasoline to create a napalm-like substance that would stick to his victims and cause them more pain. Perez and Banta, both engulfed in flames, ran out of the apartment.

¶6 Yates and Uhl also escaped the apartment, which had caught on fire. Yates put out the flames on Banta using a blanket. Mary Near, the occupant of the other apartment in the duplex, awoke to the smell of smoke, quickly dressed, and ran from her apartment, which was also on fire. When firefighters arrived, the apartment was fully engulfed in flames.

¶7 At the hospital, Perez, screaming in pain, pleaded,

3

"Help me, help me. Get the pain away." Burns covered eighty percent of Perez's body and caused his death on July 14, 2002. Banta was also conscious and in extreme pain; third degree burns covered approximately three-quarters of her body. At the hospital, Banta identified McGill as the person who set her on fire.

¶8 Meanwhile, at Barnhart's house, Hardesty told Johnson that McGill had just called and asked "if it smelled like burning flesh." Referring to Johnson, McGill asked Hardesty or Barnhart, "Is he going to talk?" Johnson testified that someone, either McGill, Hardesty, or Barnhart, threatened him with harm if he reported anything about the murder.

**B.**

¶9 A grand jury indicted McGill for the first degree premeditated murder of Charles Perez, the attempted first degree murder of Nova Banta, two counts of arson, and the endangerment of Jack Yates, Jeffrey Uhl, and Mary Near.

¶10 As a prosecution witness, Nova Banta identified Leroy McGill as the man who attacked her. She also showed the jury the injuries she sustained from the fire. Dr. Phillip Keen testified to the nature and extent of Perez's injuries. During his testimony, he discussed photographs of Perez's corpse, once before the jury saw the photographs, and then again as the State displayed them. The defense put on only one witness, Sophia

4

Barnhart, who claimed that McGill was not involved with the fire. After deliberating less than an hour, the jury returned a guilty verdict on all counts.

¶11 At the close of the aggravation phase of the trial, the jury unanimously found that McGill had been convicted of prior serious offenses, Ariz. Rev. Stat. (A.R.S.) § 13-703.F.2 (2001); that he knowingly created a grave risk of death to persons other than the victim, A.R.S. § 13-703.F.3; and that he committed the offense in both an "especially cruel" and an "especially heinous or depraved" manner, A.R.S. § 13-703.F.6.

¶12 In the penalty phase, McGill put on evidence that he had an abusive childhood; that he was psychologically immature and, as a result, his girlfriend had greater than normal influence over him; that he suffered from some degree of mental impairment; that he performed well in institutional settings; and that his family cares about him. The State put on rebuttal evidence, including evidence that while awaiting trial McGill attempted to have a potential witness against him killed. The prosecution also read into the record a letter from Perez's sister, which expressed the sorrow Perez's family experienced as a result of his death. The jury found that McGill's mitigation evidence was not sufficiently substantial to call for leniency and, therefore, determined that death was the appropriate sentence. *See* A.R.S. § 13-703.01.H (Supp. 2005).

5

**II.**

¶13      McGill raises issues concerning each phase of his trial.  We first address his assertion that the trial court abused its discretion in dismissing one of the jurors for cause. Next, we consider issues related to the assertion that McGill endangered Uhl, Yates, and Near by starting a fire in their building.  We also address issues related to the State's allegation that McGill murdered Perez in an especially heinous, cruel, or depraved manner, *see* A.R.S. § 13-703.F.6.  Finally, we consider issues arising from the penalty phase and independently determine whether the mitigation is sufficiently substantial to merit leniency.  A.R.S. §§ 13-703.E, -703.04 (Supp. 2005).

**A.**

¶14      McGill contends that the trial court abused its discretion in dismissing Juror 58 for cause.  "[T]he State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985).  This Court reviews a decision to excuse a juror for cause for abuse of discretion. *State v. Medina*, 193 Ariz. 504, 511 ¶ 18, 975 P.2d 94, 101 (1999).

¶15      Juror 58 stated that, if called upon to impose the death penalty, she would have to choose between being sanctioned

6

by the government or punished by God. She said that she could follow the law, but only because "you guys would come after me. I would—if it was the law, I would, but I'd still have like the fear of God on my shoulders." When asked explicitly, "Do you think that your ability to do the things that you're supposed to do as a juror—do you think that ability would be impaired," Juror 58 said, "Yes." The trial court did not abuse its discretion in determining that Juror 58's beliefs would "substantially impair the performance of [her] duties," *Wainwright*, 469 U.S. at 424 n.5.

**B.**

¶16 We consider three issues related to the State's allegation that McGill placed Uhl, Yates, and Near in danger by starting a fire in their building. McGill asserts that the trial court erred in denying his motion to dismiss the three counts of endangerment. He also argues that convicting him of endangerment under A.R.S. § 13-1201.A (2001) and then using the same conduct to establish his eligibility for the death penalty under A.R.S. § 13-703.F.3 violates the Double Jeopardy Clause of the Fifth Amendment, U.S. Const. amend. V. We also independently determine whether, in killing Perez, McGill "knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense," A.R.S. § 13-703.F.3.

7

**1.**

¶17    McGill argues that the State presented insufficient evidence to support the three endangerment convictions.  "A person commits endangerment by recklessly endangering another person with a substantial risk of imminent death or physical injury."  A.R.S. § 13-1201.A.  The statute requires the State to show that McGill was "aware of and consciously disregard[ed] a substantial and unjustifiable risk that" his actions would place another person in substantial risk.  A.R.S. § 13-105.9(c) (2002) (defining recklessly).  When reviewing for sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have convicted the defendant of the crime in question.  *State v. Montaño*, 204 Ariz. 413, 423 ¶ 43, 65 P.3d 61, 71 (2003).

¶18    The facts presented permitted the jury to convict McGill of endangerment of Uhl and Yates.  McGill knew that Uhl and Yates were in the apartment before he threw gasoline on Banta and Perez.  He told Detective Thomas Kulesa that he saw Yates go into the bedroom shortly before the fire, and Uhl answered the door to let McGill into the apartment.  Also, in warning the Keiths to leave the apartment, McGill demonstrated that he knew his actions would create a danger for those inside.  Thus, sufficient evidence permitted a rational trier of fact to

8

convict McGill of endangerment with regard to Uhl and Yates.

¶19    McGill asserts that the trial judge should have dismissed the endangerment count involving Near because McGill did not know that anyone lived in the other apartment.  Even assuming the truth of that statement, a reasonable jury could find that, in starting a fire in such a small building, McGill was "aware of and consciously disregard[ed] a substantial and unjustifiable risk," A.R.S. § 13-105.9(c), that the other apartment would be occupied and that his actions would create a "substantial risk of imminent death or physical injury" for its occupant, A.R.S. § 13-1201.A.  Thus, sufficient evidence permitted a rational trier of fact to convict McGill of endangerment with regard to Near.

**2.**

¶20    McGill next argues that the State punished him twice for the same offense and thus violated his protection against double jeopardy.  According to McGill, he was punished once for putting Uhl and Yates in danger when he was sentenced to two years of incarceration for each of the endangerment counts under A.R.S. § 13-1201.A and again when he was sentenced to death, based in part on the zone of danger aggravator under A.R.S. § 13-703.F.3.

¶21    The Double Jeopardy Clause, U.S. Const. amend. V, protects defendants against both multiple prosecutions and

9

multiple punishments for the same offense. *Witte v. United States*, 515 U.S. 389, 391 (1995). This Court determines de novo whether the State violated a defendant's right against double jeopardy. *State v. Moody*, 208 Ariz. 424, 437 ¶ 18, 94 P.3d 1119, 1132 (2004). Because violation of the Double Jeopardy Clause would be fundamental error, we consider the issue even though McGill raised it for the first time on appeal. *See State v. Bible*, 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (1993).

¶22 As a preliminary matter, we must decide whether to compare the elements of the endangerment offense with only the F.3 aggravator or with capital murder as a whole. The United States Supreme Court has held that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense.'" *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). Thus, because we regard the F.3 aggravator as an element of capital murder, and not as a separate offense, we will compare the elements of endangerment to the elements of capital murder to determine whether they are the same offense. *See also Sattazahn v. Pennsylvania*, 537 U.S. 101, 108–09 (2003) (holding that aggravating factors are not independent offenses for purposes of double jeopardy analysis).

¶23 "[W]here the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the

10

double jeopardy bar applies." *United States v. Dixon*, 509 U.S. 688, 696 (1993). In applying the same-elements test, we compare the elements required by statute to establish each offense. *Id.* at 697. If "each offense contains an element not contained in the other," then they are two separate offenses. *Id.* at 696.

¶24    To satisfy the statutory elements of endangerment, a person must "recklessly endanger[] another person with a substantial risk of imminent death *or physical injury*." A.R.S. § 13-1201.A (emphasis added). First degree murder requires that a person knowingly cause the death of another with premeditation. A.R.S. § 13-1105.A (2001 & Supp. 2005). When the State proves at least one aggravator defined in A.R.S. § 13-703.F, murder is punishable by death. A.R.S. § 13-703.01.D.

¶25    A person guilty of endangerment has not necessarily satisfied any element of capital murder because one may be guilty of endangerment by recklessly creating a substantial risk of physical injury; to satisfy the functional equivalent of an element of capital murder, the F.3 aggravator, a person must knowingly create a grave risk of death. Likewise, a person guilty of capital murder has not necessarily satisfied the elements of endangerment because one may be guilty of capital murder if one of the aggravators other than F.3 applies. *See, e.g.*, A.R.S. § 13-703.F.2 (defendant "was previously convicted of a serious offense"); -703.F.5 (committing the murder "as

11

consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value"); -703.F.6. (committing the murder in "an especially heinous, cruel or depraved manner"). Thus, under the same-elements test, McGill may be punished both for endangering Uhl and Yates and for murdering Perez without violating the Double Jeopardy Clause.

**3.**

¶26    We independently determine whether the State established the F.3 aggravator.  A.R.S. § 13-703.04; *State v. Roseberry*, 210 Ariz. 360, 373 ¶ 77, 111 P.3d 402, 415 (2005). Section 13-703.F.3 directs the trier of fact to consider it an aggravating circumstance if "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense."  The grave risk of death must be the result of the murderous act and the person at risk must be a person other than an intended victim.  *See, e.g., State v. Carreon*, 210 Ariz. 54, 67 ¶ 63, 107 P.3d 900, 913 (2005) (collecting recent cases).  Because the statute requires that McGill knowingly created the risk, the State must show that McGill was aware that bystanders were present and "believe[d] that his . . . conduct" would create a grave risk of death to those bystanders.  A.R.S. § 13-105.9(b) (defining knowingly); *see State v. Wood*, 180 Ariz. 53, 69, 881 P.2d 1158, 1174 (1994).

12

¶27    The trial court correctly granted McGill's motion to dismiss the aggravator as it related to Mary Near because McGill did not know that the attached apartment was occupied. Indeed, the prosecutor conceded, "I don't have any evidence that he knew that Mary Near was there."

¶28    McGill did know that Uhl was in the apartment because the two men had just finished a conversation with Eddie Keith before McGill entered the apartment. During that conversation, McGill agreed to spare Yates, which indicates he knew Yates was in the apartment. Also, McGill told Detective Kulesa that just before the fire, he saw Yates go into the bedroom. McGill apparently did not intend to harm either Uhl or Yates. Thus, the only questions remaining are whether McGill should have known that he would create a risk of grave harm to the two men and whether he did create such a risk.

¶29    McGill set two people on fire using gasoline in a very small apartment. He used enough gasoline to cause the entire structure to quickly become engulfed in flames. On the other hand, both of these adult men easily escaped the burning apartment. Yates was awake behind a closed door, and Uhl had just let McGill into the apartment and was aware of McGill's plan based on his conversation with him moments earlier. The law does not require, however, that McGill's actions be the most risky imaginable. McGill "[wa]s aware or believe[d]," A.R.S. §

13

13-105.9(b), that setting the structure on fire "created a grave risk of death," A.R.S. § 13-703.F.3, for Uhl and Yates. The State proved this aggravator beyond a reasonable doubt.

## C.

## 1.

¶30    We next review issues related to the State's allegation that McGill murdered Perez in an especially heinous, cruel, or depraved manner, *see* A.R.S. § 13-703.F.6. McGill argues that the trial court abused its discretion by admitting photographs of Perez's body into evidence. In assessing the admissibility of photographs, courts consider the photographs' relevance, the likelihood that the photographs will incite the jurors' passions, and the photographs' probative value compared to their prejudicial impact. *State v. Davolt*, 207 Ariz. 191, 208 ¶ 60, 84 P.3d 456, 473 (2004). This Court reviews a trial court's rulings on the admissibility of evidence for abuse of discretion. *Id.*

¶31    During the guilt phase, in what the trial court described as "an overabundance of caution," it did not admit a picture of Perez's face, but did admit photographs of Perez's hand, his full body, his back, and his leg. During the aggravation phase, the court admitted the picture of Perez's face as well. In each photograph, the body is discolored and swollen. The prosecution's medical expert, Dr. Keen, explained

14

to the jury that the surgical incisions visible in the photographs resulted from medical procedures to relieve swelling caused by the burns. The judge described the pictures as "certainly unpleasant" but not "gruesome."

¶32 McGill does not argue that the pictures are irrelevant, and the likelihood that they would incite the passions of the jury is slight because the photographs are not gruesome. Therefore, we focus on whether the photographs' prejudicial impact substantially outweighs their probative value. *Davolt*, 207 Ariz. at 209 ¶ 63, 84 P.3d at 474. We agree with McGill that the probative value of these photographs is reduced because he did not contest the manner of death or the suffering associated with being burned alive, the facts the State established with the photographs. *See id.* at 208-09 ¶¶ 62–63, 84 P.3d at 473-74 ("The probative value of relevant evidence is minimal when the defendant does not contest a fact that is of consequence."). On the other hand, the trial judge could justifiably conclude that their prejudicial impact on the jury also was minimal. The prosecution needed to provide the jury with descriptions of the manner in which the victim was killed and the pain the victim suffered because the State had the burden of proving each element of the murder and that the murder was especially cruel. *See id.* at 208 ¶ 61, 84 P.3d at 473. We consider it unlikely that the pictures added much to

15

any sense of shock the jurors experienced from hearing the injuries described. *See State v. Harding*, 141 Ariz. 492, 499, 687 P.2d 1247, 1254 (1984) (holding that permitting photographs of "little probative value" was not reversible error because they were also not "unfairly prejudicial"). The trial court did not abuse its discretion, during either the guilt or aggravation phase, in admitting the photographs.[1]

### 2.

¶33    This Court independently determines whether the State has proven that McGill murdered Perez in an especially cruel manner. "Cruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (citation omitted).

¶34    Setting a conscious person on fire necessarily causes the victim tremendous suffering. *See State v. Schurz*, 176 Ariz.

---

[1]    McGill also asserted that (1) the trial court erred in separating the F.6 aggravator into only two factors, "cruel" and "heinous/depraved," on the verdict form, thus preventing the jury from separately indicating its findings as to heinousness and depravity and (2) the trial court erred by instructing the jury on helplessness because the evidence in this case did not support such a finding. We need not consider either argument, however, because in this case the jurors unanimously found the murder to be cruel, which alone satisfies the F.6 aggravator, *see State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980) ("The statutory expression is in the disjunctive, so either all or one could constitute an aggravating circumstance.").

16

46, 56, 859 P.2d 156, 166 (1993). In addition, McGill enhanced Perez's suffering by concocting a napalm-like mixture of gasoline and styrofoam intended to stick to his victims and make it more difficult for rescuers to put out the fire. The State proved beyond a reasonable doubt that McGill's murder of Perez was especially cruel and therefore established the F.6 aggravator. *See State v. Towery*, 186 Ariz. 168, 187, 920 P.2d 290, 309 (1996) (holding that a finding of cruelty establishes the F.6 aggravator even without reaching heinousness or depravity).

### 3.

¶35 In addition to the two aggravators discussed above, the State alleged that McGill was eligible for the death penalty because he was "previously convicted of a serious offense," A.R.S. § 13-703.F.2. The State alleged that McGill had been convicted of two counts of armed robbery in 1986. Robbery is a serious offense, A.R.S. § 13-703.H.8, and the defense did not challenge the fact of the convictions. The State proved this aggravator beyond a reasonable doubt.

### D.

¶36 McGill makes two arguments related to the penalty phase. He asserts that the trial court erred in admitting certain testimonial hearsay during the penalty phase and that the Constitution forbids requiring a defendant to prove

17

mitigating evidence by a preponderance of the evidence.

**1.**

¶37     McGill claims that the trial court improperly allowed testimony, which McGill had no opportunity to cross-examine, to be admitted as rebuttal to his mitigation evidence.  He bases his argument on three alternative theories:  the testimony is improper rebuttal; allowing the testimony violates the Confrontation Clause, U.S. Const. amend. VI; and allowing the testimony violates his rights under the Due Process Clause, U.S. Const. amend. XIV.

¶38     In June 2003, the State deposed Floyd Lipps, who told the prosecutor that he met McGill while they were both incarcerated at the Madison Street jail.  Defense counsel was not present during this deposition, and Lipps was not subject to cross-examination.  Lipps claimed that McGill asked him to kill Uhl because McGill believed that the State could convict him only if Uhl testified.  In October 2004, the prosecution scheduled a second deposition that defense counsel attended. Unfortunately, Lipps, who was hospitalized at the time, was either too sick or too uncooperative to permit an effective examination.  Lipps died before the trial.  During the guilt phase of the trial, the prosecution did not introduce the statement Lipps provided in June 2003.  During the penalty phase, however, Detective Stephen Lewis testified, over McGill's

18

objection, about Lipps's statements made during the 2003 deposition. Detective Lewis also testified that Lipps gave the State a note during the first interview. The note, on which the State found McGill's fingerprints, contained a description of Uhl. The prosecution also argued that the handwriting on the note matched the handwriting on a letter McGill wrote to his niece.

¶39     In December 2002, Detective Kulesa interviewed Uhl as a part of the investigation into Perez's murder. Because Uhl died before the trial, Kulesa related his conversation with Uhl to the jury. Uhl identified McGill as the person who set Banta and Perez on fire and provided many of the details that would later be corroborated by the testimony of Keith, Johnson, and Banta. Kulesa also gave the jury a physical description of Uhl that included reference to a tear drop tattoo under his right eye and the fact that his right eye was deformed. This description matches the description on the note Lipps provided to Detective Lewis. McGill's counsel objected to Kulesa's testimony "based on the Sixth Amendment"; the trial court overruled her objection.

**a.**

¶40     We first decide whether the trial court erred in admitting the statements of Lipps and Uhl as relevant rebuttal evidence. Under A.R.S. § 13-703.C (Supp. 2005),

> [a]t the penalty phase of the sentencing proceeding that is held pursuant to § 13-703.01, the prosecution or the defendant may present *any information that is relevant to any of the mitigating circumstances* included in subsection G of this section, regardless of its admissibility under the rules governing admission of evidence at criminal trials.

(Emphasis added.) Because the statute expressly states that the rules of evidence do not govern questions of admissibility at the penalty phase,[2] the relevancy requirement of A.R.S. § 13-703.C, rather than the rules of evidence, determines whether evidence is admissible at the penalty phase. That statutory directive requires that we examine our customary standard for reviewing evidentiary issues decided by a trial court. When a trial court's ruling depends upon its interpretation of a statute, we generally review that ruling de novo. *State v. Gomez*, 212 Ariz. 55, ___ ¶ 3, 127 P.3d 873, 874 (2006). We review a trial court's evidentiary rulings, however, for abuse of discretion. *Davolt*, 207 Ariz. at 208 ¶ 60, 84 P.3d at 473. For two reasons, we conclude that we will give deference to a trial judge's determination of whether rebuttal evidence offered during the penalty phase is "relevant" within the meaning of the statute. First, although the relevance requirement derives from the statute, and explicitly is not governed by "admissibility

---

[2]    In contrast, A.R.S. § 13-703.B (Supp. 2005) expressly provides that the rules of evidence applicable to criminal trials govern the admissibility of evidence at the aggravation phase of the sentencing hearing.

under the rules governing admission of evidence at criminal trials," A.R.S. § 17-703.C, the judge's analysis in determining relevance involves fundamentally the same considerations as does a relevancy determination under Arizona Rule of Evidence 401 or 403. In addition, in interpreting a statute, courts apply the ordinary meaning of the statute's terms. A.R.S. § 1-213 (2002); *State v. Raffaele*, 113 Ariz. 259, 262, 550 P.2d 1060, 1063 (1976). The ordinary meaning of relevant, "affording evidence tending to prove or disprove the matter at issue or under discussion," *Merriam-Webster's Collegiate Dictionary* 1051 (11th ed. 2003), is very similar to Rule 401's definition of relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." For these reasons, we will give deference to the trial court's decision as to the relevance of evidence offered pursuant to section 13-703.C.

¶41    The State argued that Floyd Lipps's initial deposition was relevant to two components of McGill's mitigation case. The trial judge agreed, explaining that the testimony "directly rebuts what was presented to the jury about both [Hardesty]'s alleged influence over the defendant and, secondly, the fact that he does well when incarcerated."

¶42    McGill had presented extensive mitigation testimony

21

from his friends and family regarding Hardesty's wickedness and her control over him. For example, one family friend testified, "I don't know how to describe it, but I seen it in her eyes the day I met her, that she's a person that tries to take control of your mind, your soul and your being."

¶43 McGill also attempted to show the jury that he would do well while incarcerated. As a boy, McGill stayed in two children's homes. His mitigation specialist testified that McGill's school attendance and behavior improved while in these homes. The defense psychologist said, "[McGill] just blossomed under those sort of circumstances, but that's the only place I can find that ever happened, he ever had that kind of environment." The mitigation specialist also discussed McGill's time in prison for armed robbery, reading from an evaluation that stated that McGill worked well in prison and required little supervision.

¶44 Lipps's testimony was relevant to both theories of mitigation. Contracting while incarcerated to have a potential witness against him killed suggests that McGill would not be a model prisoner. The testimony also illustrates that McGill is capable of attempting to harm others, even when he is away from Hardesty. Lipps's testimony is, therefore, "information that is relevant to any of the mitigating circumstances," A.R.S. § 13-703.C. Information gathered from Detective Kulesa's questioning

of Uhl is also relevant in that it not only corroborates the statement Lipps gave to the prosecution and the testimony of Banta but also explains why McGill would want to have Uhl killed. The trial court did not err in applying the relevancy requirement of A.R.S. § 13-703.C to the statements of Lipps and Uhl.

**b.**

¶45 McGill also asserts that the Sixth Amendment's Confrontation Clause, as interpreted in *Crawford v. Washington,* 541 U.S. 36 (2004), prohibits the use of the statements of Lipps and Uhl to rebut mitigation offered during the penalty phase.[3] This Court reviews alleged constitutional violations de novo. *State v. Glassel*, 211 Ariz. 33, 50 ¶ 59, 116 P.3d 1193, 1210 (2005).

¶46 The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

---

[3] The protections of the Confrontation Clause apply only to testimonial evidence. In *Crawford v. Washington*, the Court explained that testimonial statements include, among others, "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." 541 U.S. 36, 51–52 (2004) (internal quotation marks omitted). *See also Davis v. Washington*, 126 S.Ct. 2266, 2274-75 (2006) (holding that statements "are testimonial when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution") (footnote omitted). For the purpose of our analysis, we assume that the statements made by Lipps and Uhl are testimonial.

confronted with the witnesses against him." Just as "[t]he Constitution's text does not alone resolve" to what extent statements not subject to cross-examination may be admitted during trial, *Crawford*, 541 U.S. at 42, the Constitution's text does not alone resolve whether the right to confront adverse witnesses extends to sentencing hearings.

¶47     To decide that question, we look first to *Williams v. New York*, the only case in which the United States Supreme Court directly addressed a defendant's right to confront witnesses during sentencing. 337 U.S. 241 (1949).[4] The Court held that the right does not apply to sentencing proceedings. *Id.* at 251-52.

¶48     The trial judge sentenced Williams to death based, in part, on testimonial information contained in a presentence report. *Id.* at 242–43. Williams asserted that because the information was "supplied by witnesses with whom [he] had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal," the process was unconstitutional. *Id.* at 243 (citing *People v. Williams*, 83 N.E.2d 698 (N.Y. 1949)). Applying an historical analysis similar to that employed later

---

[4]     The Court decided *Williams* based on the Fourteenth Amendment's Due Process Clause because the Sixth Amendment's Confrontation Clause was not applied to the states until 1965 by *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

24

by the Court in *Crawford*,[5] the *Williams* Court relied on historical practices to evaluate Williams' claim. The Court noted that "[o]ut-of-court affidavits have been used frequently" during sentencing and that

> both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.

*Id.* at 246. This practice ensured "that a sentencing judge [would] not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Id.* at 247. In accord with its historical review and analysis, the *Williams* Court concluded that the right to confront adverse witnesses has never applied to sentencing.[6] In the more than

---

[5]    In *Crawford*, the Court explained that it must "turn to the historical background of the [Confrontation] Clause to understand its meaning." 541 U.S. at 43.

[6]    At the turn of the last century, the South Carolina Supreme Court traced the common usage of affidavits in sentencing to the English courts, writing:

> Certainly there is no ground for saying that [using affidavits in sentencing] would deny to the defendant the constitutional right to be confronted by witnesses against him and to have the privilege of cross-examining them, for the reason that the verdict of the jury is not affected. Thus, in this case, the defendant would remain guilty of manslaughter in spite of the affidavits that were submitted to the presiding

fifty years since it decided *Williams*, the Supreme Court has never suggested otherwise.

¶49 Arizona also has long held that use of hearsay evidence at the penalty phase of a trial does not violate the Confrontation Clause. In *State v. Ortiz*, this Court addressed the admissibility of evidence used to rebut the defendant's mitigation evidence. 131 Ariz. 195, 208–09, 639 P.2d 1020, 1033–34 (1981), *overruled on other grounds by State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983). Ortiz had been convicted of conspiracy and, during the sentencing hearing, the State presented the testimony Ortiz's wife had given during her earlier conspiracy trial to rebut Ortiz's assertion that he was a good father and husband. *Id.* at 208, 639 P.2d at 1033. The transcript of her sentencing hearing included descriptions of Ortiz beating her and threatening her with a gun. *Id.* Because she did not testify at Ortiz's hearing, he asserted that "admission of this testimony violated his confrontation clause rights under the Sixth and Fourteenth Amendments to the United States Constitution." *Id.*

¶50 In *Ortiz*, we began our analysis by "observing that by its terms, the confrontation clause applies only to 'trials' and

---

judge.

*State v. Reeder*, 60 S.E. 434, 435 (S.C. 1908).

26

not to sentencing hearings," *id.* at 209, 639 P.2d at 1034, which, consistent with *Williams*, indicates that the right of confrontation does not apply to sentencing. Although we acknowledged that *State v. Hanley*, 108 Ariz. 144, 493 P.2d 1201 (1972), held that, at sentencing, a defendant has a "right to produce mitigating evidence through cross-examination," we concluded that a defendant has no right to an "opportunity to rebut rebuttal evidence through cross-examination." 131 Ariz. at 209, 639 P.2d at 1034.

¶51    In *State v. Greenway*, we distinguished between hearsay used to *establish an aggravating factor*, to which the Confrontation Clause applies, and hearsay used to *rebut mitigation*, to which the Confrontation Clause does not apply. 170 Ariz. 155, 161 n.1, 823 P.2d 22, 28 n.1 (1991). In that case, we allowed the statement of a codefendant to be used to rebut Greenway's assertion that he was non-violent and had a diminished mental capacity. *Id.* at 161, 823 P.2d at 28; *see also State v. Nash*, 143 Ariz. 392, 401–02, 694 P.2d 222, 231–32 (1985) (allowing the State to submit reports from psychologists the defense could not cross-examine for the purpose of rebutting his mitigation evidence).

¶52    Thus, Arizona has long held that the Confrontation Clause does not apply to rebuttal testimony at a sentencing hearing because (1) the penalty phase is not a criminal

27

prosecution, (2) historical practices support the use of out-of-court statements in sentencing, and (3) the sentencing body requires complete information to make its determination.[7] We will overturn long-standing precedent only for a compelling reason, *State v. Hickman*, 205 Ariz. 192, 200 ¶ 37, 68 P.3d 418, 426 (2003), and McGill has not presented a compelling reason to do so here. Applying the long line of decisions, from *Williams* to *Greenway*, we conclude that the trial court did not violate the Confrontation Clause in admitting the statements of Lipps

---

[7] Other state and federal courts have reached the same conclusion. *See, e.g.*, *United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) (holding that *Crawford* does not overrule *Williams*); *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005) (holding that "nothing in *Blakely* or *Booker* necessitates a change in the majority view that there is no Sixth Amendment right to confront witnesses during the sentencing phase"); *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (holding that the Confrontation Clause "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty"); *Holland v. State*, 705 So. 2d 307, 328 (Miss. 1997) (holding that a defendant has "no Confrontation Clause guarantees at sentencing"); *State v. Rust*, 388 N.W.2d 483, 494 (Neb. 1986) (same); *State v. Reid*, 164 S.W.3d 286, 318-19 (Tenn. 2005) (holding that neither the Due Process Clause nor the Confrontation Clause requires Tennessee to apply the rules of evidence at sentencing). *But see, e.g.*, *Rodriguez v. State*, 753 So. 2d 29, 43 (Fla. 2000) ("We start with the uncontroverted proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial."); *Ball v. State*, 699 A.2d 1170, 1190 (Md. 1997) (holding the Confrontation Clause "extends to the sentencing phase of a capital trial and applies to [live,] victim impact witnesses as well as factual witnesses") (quoting *Grandison v. Shade*, 670 A.2d 398, 413 (Md. 1995)); *Commonwealth v. Green*, 581 A.2d 544, 564 (Pa. 1990) (vacating death sentence and remanding for resentencing because defendant could not cross-examine state's rebuttal witness during mitigation).

28

and Uhl to rebut McGill's mitigation evidence.

## c.

¶53    McGill also claims that the trial court violated his right to due process by allowing the State to rebut his mitigation evidence with testimonial hearsay.  This Court reviews alleged constitutional violations de novo.  *Glassel*, 211 Ariz. at 50 ¶ 59, 116 P.3d at 1210.

¶54    In *Skipper v. South Carolina*, the Court noted that due process requires "that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'"  476 U.S. 1, 5 n.1 (1986) (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)).  In compliance with that principle, this Court has allowed testimonial hearsay to rebut mitigation when the "defendant knew about the statements and had an opportunity to either explain or deny them."  *Greenway*, 170 Ariz. at 161, 823 P.2d at 28.

¶55    In *Gardner v. Florida*, the sentencing judge used a "presentence investigation report contain[ing] a confidential portion which was not disclosed to defense counsel." 430 U.S. at 353.  The Supreme Court explained that sentencing a defendant to death without disclosing all of the information used in making that decision denied the defendant due process because "[t]he risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by

29

the sentencing judge, is manifest." *Id.* at 359. The State argued that it could lose confidential sources if forced to reveal the information they provided to the defendant, but the Court found that "the interest in reliability plainly outweighs the State's interest in preserving the availability of comparable information in other cases." *Id.* Thus, the defendant must be given an opportunity to test the State's allegations for reliability.

¶56    The requirement that a defendant be given an opportunity to explain or deny testimonial hearsay necessarily encompasses a requirement that the evidence bear some indicia of reliability. A defendant cannot explain or deny fanciful statements or hearsay several times removed, and a jury must consider reliable information in making the difficult decision of whether to impose capital punishment. To give substance to the protection afforded by the Due Process Clause, several courts have made explicit a requirement that the evidence bear "minimal indicia of reliability" to be admitted during sentencing. *See Kuenzel v. State,* 577 So. 2d 474, 528 (Ala. Crim. App. 1990) ("While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability . . . ." (quoting *United States v.*

30

*Giltner*, 889 F.2d 1004, 1007 (11th Cir. 1989)).[8] We agree that, in addition to the requirements explicitly stated in *Greenway*, hearsay testimony must have sufficient indicia of reliability to be responsible evidence. *See Williams v. Oklahoma*, 358 U.S. 576, 584 (1959) (holding that a court may "consider *responsible* unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics" without running afoul of due process) (emphasis added). We conclude that the State's rebuttal evidence met these requirements.

¶57 McGill does not argue that he lacked notice of and an opportunity to respond to the contents of Lipps's and Uhl's statements. The question then is whether these statements were accompanied by sufficient indicia of reliability.

¶58 Other evidence corroborated Uhl's statement, thereby

---

[8] *See also People v. Hall*, 743 N.E.2d 521, 548 (Ill. 2000) (holding that hearsay is admissible at sentencing "as long as the evidence satisfies the relevancy and reliability requirement"); *State v. Pierce*, 138 S.W.3d 820, 825 (Tenn. 2004) (noting that Tennessee statute allows "reliable hearsay" to be used at sentencing); *Peden v. State*, 129 P.3d 869, 872 (Wyo. 2006) ("[S]entencing must ensure that the information the sentencing court relies upon is reliable and accurate . . . ." (quoting *Kenyon v. State*, 96 P.3d 1016, 1021 (Wyo. 2004)(internal quotation marks omitted)). Section 6.A.1.3(a) of the Federal Sentencing Guidelines (2003) also requires a showing of reliability, stating that "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, *provided that the information has sufficient indicia of reliability* to support its probable accuracy." (Emphasis added.)

providing indicia of reliability.  The testimony of Banta, Johnson, and Keith corroborated the information Uhl provided Detective Kulesa.  Sufficient indicia of reliability also supported Lipps's statement.  The note that Lipps produced contained McGill's fingerprints and handwriting; Uhl, the target of the murder for hire, indeed could have been a witness against McGill; Uhl's physical appearance matched the description on the note; and Lipps did have an opportunity to receive the note from McGill.  All these facts corroborate the account that Lipps gave.  We conclude, therefore, that admitting Lipps's and Uhl's statements did not offend McGill's right to due process.

## 2.

¶59     McGill also asserts that it is unconstitutional to require that he prove mitigation evidence by a preponderance of the evidence.  This Court has held on several occasions that requiring a defendant to prove mitigating circumstances by a preponderance of the evidence does not violate the federal Constitution.  *See, e.g.*, *Medina*, 193 Ariz. at 514-15 ¶ 43, 975 P.2d at 104-05.  The trial court did not err in requiring that McGill prove his mitigating circumstances by a preponderance of the evidence.

## E.

¶60     This Court "independently determines 'if the mitigation is sufficiently substantial to warrant leniency in

32

light of existing aggravation.'" *Roseberry*, 210 Ariz. at 373 ¶ 77, 111 P.3d at 415 (quoting *State v. Greene*, 192 Ariz. 431, 443-44 ¶ 60, 967 P.2d 106, 118-19 (1998)); A.R.S. § 13-703.04.

¶61 The trial court instructed the jury on the following non-exclusive list of mitigating factors: (1) the Defendant suffered from an abusive childhood; (2) the Defendant was psychologically immature; and (3) the Defendant was mentally impaired. In addition to these factors, McGill presented evidence that he would do well in an institutional setting and that his family would suffer if he is put to death.

¶62 McGill suffered from an abusive and neglectful childhood. His mother first sent him to an institution for troubled children when he was only eight years old, visited him infrequently, told a school official that thirteen-year-old McGill "has no interests or talents," and banished McGill from her home when he was sixteen years old. His stepfather beat him and his brothers. McGill proved by a preponderance of the evidence the existence of a troubled childhood.

¶63 He argues that his troubled childhood interfered with his ability to develop a sense of right and wrong and that the cruel and senseless murder of Charles Perez manifested that deficiency. Although McGill's mother was neglectful and his stepfather was abusive, even the defense psychologist recognized that McGill was given an opportunity to thrive while at the

33

homes for troubled children.  McGill was able to maintain a healthy relationship with his siblings.  He had opportunities to reform his life.  Moreover, the impact of McGill's upbringing on his choices has become attenuated during the two decades between his reaching adulthood and committing this murder.  For these reasons, McGill's neglectful and abusive childhood provides only slight mitigation for this crime.

¶64    During her closing argument at the penalty phase, McGill's attorney reminded the jury that "[t]he evidence suggests that [Hardesty] is very, very much in control of this relationship with [McGill] and evidence suggests that [McGill] will do anything, absolutely anything to keep [Hardesty] happy." McGill did not, however, provide any evidence that Hardesty specifically urged him to murder Perez.  Proving that McGill desired to impress his girlfriend, even if that desire was extreme and exceeded that found in a psychologically healthy person, does not itself demonstrate that Hardesty's influence caused this murder.  The lack of "a causal connection may be considered in assessing the quality and strength of the mitigation evidence." *State v. Newell*, 212 Ariz. 389, ___ ¶ 82, 132 P.3d 833, 849 (2006).  Moreover, McGill did not explain why, when in jail and outside the influence of Hardesty, he nonetheless attempted to have Uhl killed.  Although McGill demonstrated that Hardesty influenced him, the preponderance of

the evidence does not suggest that her influence was so strong as to explain his conduct.

¶65     McGill is neither mentally retarded nor insane.  His overall IQ is 92, which is at the low end of the average range.  The defense expert noted that McGill "has chronic and significant psychological difficulties," but could not identify any mental disorder from which McGill suffers.  The defense did not prove mental impairment by a preponderance of the evidence.

¶66     Much of McGill's evidence during the mitigation phase focused on his improved performance while in institutions.  Evidence that a defendant will be a "model prisoner" provides non-statutory mitigation.  *State v. White*, 194 Ariz. 344, 355 ¶ 47, 982 P.2d 819, 830 (1999).  As a child, McGill's grades and behavior improved while under intense supervision.  Likewise, while in prison for robbery, McGill did not have any serious discipline problems.  In light of the State's evidence that McGill attempted to have a potential witness against him murdered, however, the evidence provides little support for the claim that McGill would be a model prisoner.

¶67     The testimony of McGill's sister and brothers demonstrated that McGill's family will be hurt by his execution.  The existence of family ties is a mitigating factor.  *State v. Carriger*, 143 Ariz. 142, 162, 692 P.2d 991, 1011 (1984).  The defense proved this mitigation by a preponderance of the

evidence.

¶68     Although McGill's mitigation is not insignificant, it does little to offset the considerable aggravation established by the State.  On balance, the mitigation is not sufficiently substantial to call for leniency.

### III.

¶69     For purposes of federal review, McGill raises fourteen challenges to the constitutionality of Arizona's death penalty scheme. He concedes that this Court has previously rejected these arguments.

¶70     (1) McGill claims that the State's failure to allege an element of a charged offense, the aggravating factors that made the Defendant death eligible, is a fundamental defect that renders the indictment constitutionally defective. We rejected this argument in *McKaney v. Foreman*, 209 Ariz. 268, 271 ¶ 13, 100 P.3d 18, 21 (2004).

¶71     (2) He asserts that the application of the new death penalty statute passed in response to *Ring v. Arizona*, 536 U.S. 584 (2002), violates a defendant's right against *ex post facto* application of new laws.  We rejected this argument in *State v. Ring*, 204 Ariz. 534, 547 ¶ 23, 65 P.3d 915, 928 (2003).

¶72     (3) He claims that the F.6 aggravator is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when it is met.

36

The Court rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188-90 ¶¶ 38–45, 119 P.3d 448, 455–57 (2005).

¶73    (4) According to McGill, introducing victim impact evidence at the penalty phase of the trial is improper because a defendant does not receive prior notice of the information and is denied the right to cross-examine the evidence. The Court rejected challenges to the use of victim impact evidence in *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 16, 68 P.3d 412, 417 (2003).

¶74    (5) McGill claims that the jury instruction told jurors to assign whatever value they deemed appropriate to mitigation but instructed them not to be influenced by mere sympathy, thus limiting the mitigation the jury could consider. The Court rejected this argument in *Carreon*, 210 Ariz. at 70–71 ¶¶ 81–87, 107 P.3d at 916–17.

¶75    (6) He asserts that the death penalty is cruel and unusual under any circumstances. The Supreme Court rejected this argument in *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

¶76    (7) He claims that the death penalty is irrational and arbitrarily imposed because it serves no purpose that is not adequately addressed by life in prison. The Court rejected this argument in *State v. Smith*, 203 Ariz. 75, 82 ¶ 36, 50 P.3d 825, 832 (2002).

¶77    (8) McGill argues that the prosecutor's discretion to seek the death penalty has no standards and therefore violates

37

the Eighth and Fourteenth Amendments, and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. The Court rejected this argument in *Cromwell*, 211 Ariz. at 192 ¶ 58, 119 P.3d at 459.

¶78    (9) He claims that Arizona's death penalty discriminates against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution. We rejected this argument in *State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

¶79    (10) McGill asserts that the absence of proportionality review denies defendants due process of law. We rejected that argument in *State v. Gulbrandson*, 284 Ariz. 46, 73, 960 P.2d 579, 606 (1995).

¶80    (11) He claims that Arizona's death penalty scheme violates the Fifth, Eighth, and Fourteenth Amendments by shifting the burden of proof and requiring that a capital defendant convince jurors his life should be spared. This Court rejected this argument in *Carreon*, 210 Ariz. at 76 ¶ 122, 107 P.3d at 922.

¶81    (12) He asserts that the death penalty is unconstitutional because it permits jurors unfettered discretion to impose a death sentence without adequate guidelines to weigh and consider appropriate factors and fails to provide a principled means to distinguish between those defendants who deserve death and those who do not. This Court rejected this

38

argument in *State v. Johnson*, 212 Ariz. 425, \_\_\_ ¶ 69, 133 P.3d 735, 750 (2006).

**¶82** (13) McGill claims that execution by lethal injection is cruel and unusual punishment. We rejected this argument in *State v. Van Adams*, 194 Ariz. 408, 422 ¶ 55, 984 P.2d 16, 30 (1999).

**¶83** (14) According to McGill, Arizona's death penalty unconstitutionally requires the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. The Court rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

**IV.**

**¶84** For the foregoing reasons, we affirm McGill's convictions and sentences, including the capital sentence.

_____
Ruth V. McGregor, Chief Justice

CONCURRING:

_____
Rebecca White Berch, Vice Chief Justice

_____
Michael D. Ryan, Justice

_____
W. Scott Bales, Justice

**H U R W I T Z**, Justice, concurring in part and dissenting in part

**¶85**      I concur in the Court's opinion insofar as it affirms McGill's convictions and the jury's findings of statutory aggravating circumstances.  I respectfully part company with the majority, however, with respect to its rejection of McGill's Confrontation Clause claims.  *See* Op. ¶¶ 45-52.  I believe that the Confrontation Clause of the Sixth Amendment applies to the penalty phase of a capital sentencing proceeding[9] and that testimonial hearsay cannot be used to impose a death sentence.

**I.**

**A.**

**¶86**      The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."   The Supreme Court has made plain that the Confrontation Clause prohibits "admission of testimonial

---

[9]    Arizona law provides that when a defendant is convicted of first degree murder and the State seeks the death penalty, sentencing proceedings begin with an "aggravation phase" (sometimes referred to in case law as the "eligibility phase") in which the trier of fact determines whether any alleged aggravating circumstance listed in Arizona Revised Statutes ("A.R.S.") § 13-703(F) (Supp. 2005) has been proved.  A.R.S. § 13-703.01(C) (Supp. 2005).   If the trier of fact finds one or more aggravating circumstances, the sentencing proceedings move on to a "penalty phase" (sometimes referred to in case law as the "selection phase") in which the issue is whether the death penalty should be imposed.  A.R.S. § 13-703.01(D).

statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *see also Davis v. Washington*, 126 S. Ct. 2266, 2273 (2006) (quoting *Crawford*).

¶87    The majority assumes that the deposition of Floyd Lipps and the police interview of Jeff Uhl were "testimonial." Op. ¶ 45 n.3.  That assumption is clearly warranted.  Both Lipps and Uhl were questioned by agents of the state for the express purpose of obtaining evidence to be used against McGill during the penalty phase of a capital trial.  *Crawford* teaches that "the principal evil at which the Confrontation Clause was directed" was the "use of *ex parte* examinations as evidence against the accused."   541 U.S. at 50; *see also id.* at 52 ("Statements taken by police officers in the course of interrogations are . . . testimonial."); *accord Davis*, 126 S. Ct. at 2276 (holding that the product of "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) . . . is testimonial").

¶88    Because the challenged statements were testimonial and McGill had no opportunity to cross-examine either witness, the Confrontation Clause applies on its face if the statements were introduced in a "criminal prosecution."   The issue before us,

41

therefore, is whether the penalty phase of a capital sentencing proceeding is part of a criminal prosecution.[10]

## B.

¶89      As a matter of pure logic and textualism, it is difficult to characterize the penalty phase as anything other than part of a criminal prosecution.  The proceeding is, of course, designed to determine what *criminal* penalty will be imposed on one convicted of first degree murder.  Under A.R.S. § 13-703.01, the penalty phase is structured much in the same manner as the rest of a criminal trial – each side presents evidence, examines the witnesses, makes summations, and the jury is eventually left to make the ultimate determination – whether any mitigation is sufficiently substantial to call for leniency in light of the aggravation previously found.  The majority quite correctly concludes that the *aggravation* phase of a capital case is part of a criminal prosecution for Confrontation Clause purposes.  Op. ¶ 51.  Because both the aggravation and penalty phases are parts of a single capital "sentencing proceeding" under Arizona law, *see* A.R.S. § 13-703.01(A), (C),

---

[10]    Our state constitution provides that "[i]n criminal prosecutions, the accused shall have the right . . . to meet the witnesses against him face to face."  Ariz. Const. art. 2, § 24. McGill does not argue that this guarantee is different than the Sixth Amendment Confrontation Clause.    I  therefore  assume arguendo that the two are congruent. *See State v. Vincent*, 159 Ariz. 418, 432-33, 768 P.2d 150, 164-65 (1989).

42

(D), it is difficult to understand why one phase would be part of a criminal prosecution while the other would not.

¶90    The textual argument is buttressed by the Supreme Court's prior interpretations of the Sixth Amendment. The Sixth Amendment sets forth a list of rights guaranteed "[i]n all criminal prosecutions," including the right to counsel. The Supreme Court has held that the right to counsel is applicable to sentencing proceedings. *Mempa v. Rhay*, 389 U.S. 128, 137 (1967). Because the Sixth Amendment does not contain separate definitions of "criminal prosecutions" with respect to its various guarantees, it would therefore seem to logically follow that the Confrontation Clause also applies to sentencing proceedings.

¶91    But in Sixth Amendment jurisprudence, as *Crawford* warns, textualism - or even logic - is often a trap for the unwary. *See* 541 U.S. at 42-43. For example, the Supreme Court has held that the right to counsel applies to preliminary hearings. *White v. Maryland*, 373 U.S. 59, 60 (1963). Yet, hearsay is traditionally admissible in preliminary hearings. *Costello v. United States*, 350 U.S. 359, 363-64 (1956). It is therefore difficult to conclude that the term "criminal prosecutions" has the same meaning for all rights guaranteed by the Sixth Amendment.

43

¶92    As one commentator has aptly noted, the Supreme Court's Sixth Amendment jurisprudence is "best described as fragmentary." John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L. Rev. 1967, 1969 (2005). I therefore do not rely simply on the language of the Sixth Amendment in concluding that the Confrontation Clause applies to the penalty phase of a capital trial, and instead turn, as does the majority, to the case law in interpreting that language.

## C.

¶93    The majority relies upon *Williams v. New York*, 337 U.S. 241 (1949), in concluding that capital sentencing proceedings are excluded from the term "criminal prosecution" for Confrontation Clause purposes. But, as the majority acknowledges, Op. ¶ 47 n.4, *Williams* was not a Confrontation Clause case. Indeed, under the Supreme Court's jurisprudence in 1949 it could not have been; the Court did not hold the Confrontation Clause applicable to the States until sixteen years later, in *Pointer v. Texas*, 380 U.S. 400, 403 (1965). *Williams* is simply a case setting forth the minimum requirements of Fourteenth Amendment due process with respect to the use of hearsay testimony. As the majority correctly notes in its due process discussion (which I join), the Due Process Clause is

satisfied when hearsay is reliable and the defendant is given notice and an opportunity to rebut the evidence.  Op. ¶ 56.

**¶94**    As *Crawford* now makes clear, however, the Confrontation Clause requires more.   Due process requires minimal substantive reliability, but the Confrontation Clause requires "procedural" reliability - reliability obtained "by testing in the crucible of cross-examination."  *Crawford*, 541 U.S. at 61.   It is not sufficient for Confrontation Clause purposes that "testimonial hearsay" be objectively reliable; it must also be subject to cross-examination.

**¶95**    *Williams* does not resolve the issue of whether the Confrontation Clause applies to the penalty phase of capital trials.  Nor does any other Supreme Court decision.  I therefore regard the question as open.  A number of federal courts agree. *See United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) (noting that it "remains unclear whether the Confrontation Clause applies" in capital sentencing proceedings); *Proffitt v. Wainright*, 685 F.2d 1227, 1253 (11th Cir. 1982) ("Whether the right to cross-examine adverse witnesses extends to capital sentencing proceedings has not been specifically addressed by the Supreme Court."); *United States v. Jordan*, 357 F. Supp. 2d 889, 901 (E.D. Va. 2005) (stating that "it appears that no court has specifically addressed this issue" since *Crawford*).  Indeed, several state courts have directly held that the Confrontation

45

Clause applies at capital sentencing. *See, e.g., Rodriguez v. State*, 753 So. 2d 29, 44 (Fla. 2000) (holding that the admission of hearsay statements "in the penalty phase violated the Confrontation Clause"); *Ball v. State*, 699 A.2d 1170, 1190 (Md. 1997) (holding that the right of confrontation "extends to the sentencing phase of a capital trial and applies to live, victim impact witnesses as well as factual witnesses") (alteration and quotation omitted); *Russeau v. State*, 171 S.W.3d 871, 880-81 (Tex. Crim. App. 2005) (finding the Confrontation Clause applicable to capital sentencing), *cert. denied*, 126 S. Ct. 2982 (2006). Whatever the merit of these decisions (a topic I address below) they surely undercut the contention that the issue was definitively resolved in *Williams*.

**D.**

¶96     Nor do I believe that our prior cases provide conclusive guidance. Our jurisprudence on the topic has been, to put it charitably, somewhat inconsistent. In *State v. Hanley*, a non-capital case, this Court concluded that the right of cross-examination applied at sentencing. 108 Ariz. 144, 148, 493 P.2d 1201, 1205 (1972). One year later, however, in another non-capital case, this Court held, without citation to *Hanley*, that after guilt had been established, the Due Process Clause did not require a sentencing judge to allow confrontation and

46

cross-examination.  *State v. Thomas*, 110 Ariz. 106, 109, 515 P.2d 851, 854 (1973).

¶97       In *State v. Ortiz*, a capital case, this Court stated that "the confrontation clause applies only to 'trials' and not to sentencing hearings."  131 Ariz. 195, 209, 639 P.2d 1020, 1034 (1981), *overruled on other grounds by State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983).  But four years later, in another capital case, we stated that Sixth Amendment confrontation "rights extend to the sentencing phase of a trial" but are not "as strong at the sentencing phase as at trial." *State v. Nash*, 143 Ariz. 392, 401, 694 P.2d 222, 231 (1985). Then, *State v. Greenway*, another capital case, held that there is no right to confrontation during sentencing when testimony is admitted to rebut mitigating evidence (as opposed to establishing aggravating factors).  170 Ariz. 155, 161 n.1, 823 P.2d 22, 28 n.1 (1991).

¶98       Even assuming that *Ortiz* and *Greenway* were correctly decided in 1983 and 1991, they do not resolve the issue before us today.  Both cases were decided against the backdrop of *Ohio v. Roberts*, 448 U.S. 56 (1980).  *Roberts* held that the Confrontation Clause did not bar admission of an unavailable witness's statements that either fell within a "firmly rooted hearsay exception" or otherwise bore "adequate 'indicia of reliability.'"  *Id*. at 66.  *Crawford*, however, abrogated the

*Roberts* rule, providing that when hearsay is "testimonial," reliability can only be shown through an opportunity for cross-examination.  541 U.S. at 61-62.  More importantly for present purposes, *Crawford* also clarified the historical understanding of the scope of the Confrontation Clause.  Thus, our prior opinions must be reexamined in light of *Crawford*.

## E.

¶99    *Crawford* makes clear that the extent of the Confrontation Clause is to be determined not by reference to modern rules of evidence, but rather by the expectation of the Framers at the time the Sixth Amendment was adopted in 1791.  *Id.* at 43 ("We must therefore turn to the historical background of the Clause to understand its meaning.").  Thus, the ultimate issue is whether the Framers would have expected that "testimonial" hearsay could be used by a jury to determine whether a murder defendant should live or die.

¶100    The history of capital sentencing is most instructive on this point.  "[I]n 1791, the States uniformly followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses," including murder.  *Woodson v. North Carolina*, 428 U.S. 280, 289 (1976).  The jury's verdict of guilt for murder thus automatically resulted in a death sentence in 1791.  Because "[t]here was no distinction between trial rights and sentencing rights . . . in both purpose

48

and effect, the trial was the sentencing." Douglass, *supra*, at 1973.

¶101    At the time the Sixth Amendment was adopted, juries were well aware of the mandatory nature of death sentences. "Almost from the outset jurors reacted unfavorably to the harshness of mandatory death sentences." *Woodson*, 428 U.S. at 289.   When unwilling to put a defendant to death, jurors would often either acquit the defendant outright or convict of a lesser crime.  *Id.* at 290 (noting the "not infrequent refusal of juries to convict murderers rather than subject them to automatic death sentences"); *see also* William Blackstone, 4 *Commentaries* 238-39 (1966) (explaining "pious perjury," under which juries would return verdicts resulting in acquittal or conviction of a lesser crime when unwilling to sentence a defendant to death); John H. Langbein, *The English Criminal Trial Jury on the Eve of the French Revolution*, *in The Trial Jury in England, France, Germany 1700-1900* 37 (Antonio Padoa Schioppa ed. 1987) (same).

¶102    Thus, the only evidence relied upon by juries in 1791 in determining whether a defendant should receive the death sentence was the evidence presented at trial on the issue of guilt or innocence – evidence plainly covered by the Confrontation Clause.  The Framers could therefore have had no expectation that "testimonial" hearsay could have played any

49

part in the decision about whether a defendant should live or die. Consequently, *Crawford* teaches that the Confrontation Clause bars the use of such hearsay in the selection phase of modern capital penalty proceedings.

¶103    To be sure, much has changed in capital litigation since 1791. Dissatisfaction with automatic death sentences led a number of states in the nineteenth century to "abandon mandatory death sentences in favor of discretionary death penalty statutes." *Woodson*, 428 U.S. at 291. Such systems, which had become widespread by the twentieth century, permit the jury (or a sentencing judge) "to respond to mitigating factors by withholding the death penalty." *Id*. Thus, by the time *Williams* was decided, it was accurate to say that in capital cases, a sentencing judge had long exercised "wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams*, 337 U.S. at 246.

¶104    But this was not the case at the time the Sixth Amendment was adopted. Whatever the virtues of modern capital sentencing, in 1791 the decision about whether a defendant should live or die was made solely on the basis of the evidence introduced during the trial on guilt or innocence. Because it has always been clear that the trial on guilt or innocence is a "criminal prosecution," subject to the guarantees of the

Confrontation Clause, "testimonial" hearsay could have played no role in the sentencing calculus in 1791. Even though capital sentencing procedures have today changed, *Crawford* teaches that the Sixth Amendment requires that "testimonial" hearsay has no place in the capital sentencing decision.[11]

## II.

¶105 In my view, the Confrontation Clause precludes the use of testimonial hearsay by the State in the penalty phase of a capital sentencing proceeding.[12] The Lipps deposition and the Uhl interview should not have been admitted during the penalty

---

[11] This case does not require us to decide whether the Confrontation Clause applies to non-capital sentencing proceedings. While it is clear that "testimonial" hearsay played no role in capital sentencing proceedings in 1791, the historical record as to non-capital proceedings is less clear. *See Apprendi v. New Jersey*, 530 U.S. 466, 480 n.7 (2000) (noting that at the time of our founding, judicial discretion was prominent in sentencing of lesser and misdemeanor crimes); *Williams*, 337 U.S. at 246 (noting the wide discretion that sentencing judges had in colonial times with regard to the type of evidence that could be considered in cases in which the sentence was not automatically mandated by a guilty verdict).

[12] By its terms, the Confrontation Clause does not apply to evidence submitted by the defendant. Thus, my reading of the Clause does not conflict with the Supreme Court's command that the Eighth Amendment requires that the defendant be able to present a broad scope of mitigation evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (footnote omitted).

51

phase of this case.[13]  I would therefore remand for a new penalty

phase proceeding.


_____

Andrew D. Hurwitz, Justice

---

[13]  The jury might very well have returned a death verdict even in the absence of the Lipps deposition and the Uhl interview, given the strong aggravation and the relatively minimal mitigating evidence.  Because of the nature of the testimonial hearsay at issue (which accused McGill of plotting the death of Uhl), however, I cannot conclude beyond a reasonable doubt (nor does the majority suggest) that any Confrontation Clause error here was harmless. *See Chapman v. California*, 386 U.S. 18, 23 (1967) (holding that before constitutional error can be found harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt").