NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

––––––––––––––––––––––––

LUIS T., ANGELICA T., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.T., Y.T., M.T, *Appellees*.

No. 1 CA-JV 14-0115

FILED 11-04-2014

––––––––––––––––––––––––

Appeal from the Superior Court in Maricopa County
No. JD16462
The Honorable Cari A. Harrison, Judge

**AFFIRMED**

––––––––––––––––––––––––

COUNSEL

David W. Bell, Attorney at Law, Mesa
By David W. Bell
*Counsel for Appellant Luis T.*

Denise L. Carroll, Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant Angelica T.*

Arizona Attorney General's Office, Phoenix
By Michael Valenzuela
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Jon W. Thompson and Judge Donn Kessler joined.

---

**C A T T A N I**, Judge:

¶1        Luis T. ("Father") and Angelica T. ("Mother") appeal from the superior court's order terminating their parental rights as to J.T., Y.T., and M.T.  For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        Father and Mother are the biological parents of J.T. (born May 2007), Y.T. (born July 2003), and M.T. (born May 2011).  Father and Mother also have several older children, including M. (who is no longer subject to the dependency) and I. (who is now an adult).

¶3        In May 2011, the Department of Child Safety ("DCS") initiated in-home family preservation services for Mother after being alerted to safety concerns for the children when in Mother's care.  Two months later, Father was arrested for assaulting Mother, and DCS learned the children had been exposed to domestic violence between the parents on multiple occasions.  Mother then tested positive for methamphetamine in October.  DCS removed the children from the home on October 26, 2011, due to concerns of substance abuse, domestic violence, and neglect.

¶4        DCS offered Mother family preservation services, drug testing and treatment, parent-aide services with visitation, individual counseling, psychological evaluations, and a best interests assessment, and Mother participated in all services offered.  Mother completed the drug treatment program and consistently tested negative for drugs, successfully remedying the substance abuse concern.

¶5        In early 2012, after Mother had successfully completed certain reunification services, M.T. and Y.T. were returned to her care. Just six weeks later, DCS again removed the children after receiving a report that M.T. had arrived at daycare with inch-long scratches on her arm in the shape of the letters "D-I-E."  Mother had no explanation for M.T.'s injury, but suggested the daycare was to blame; the superior court found this explanation implausible.

¶6        Mother participated in parent-aide services with visitation for almost three years.  Despite her long-term participation, her interactions with the children continued to cause concern.  Her lack of explanation for M.T.'s injury suggested at least a lack of adequate supervision.  On another occasion, Mother failed to observe M.T. as the child nearly wandered into a lane of traffic.  Mother also left a sword accessible to the children during a visit, and J.T. grabbed it; Mother yelled for M. to take it away from his younger sibling.  The parent-aide notes show that Mother would "parent from the couch by yelling or screaming," often relying on Y.T. to care for the younger children during visits.

¶7        Mother's relationship with the older children I. and M. suggested Mother would continue to have trouble parenting the younger children as they grew older.  When I. and M. were returned to Mother's care as teenagers, she failed to enroll either child in high school.  Mother initially asserted that M. was enrolled in school but later claimed she was home-schooling M., although she never informed DCS or any education agency and did not create a curriculum for his studies.  Mother frequently lost track of M.; when asked where M. was, Mother told the younger children either that he was probably hanging out with friends or that she did not know where he was.  The parent aide observed that Mother failed to supervise M. during visits while he played too roughly with the younger children, even with the infant M.T.

¶8        Mother's psychological evaluation raised concerns about her ability to provide a safe home for the children.  Mother did not offer an explanation for why many of her children showed serious behavioral problems, some resulting in juvenile detention and later incarceration.  She showed little insight, offering a superficial or artificially positive self-assessment and tending to blame others rather than accepting personal responsibility.  Mother's reaction to 18-year-old I.'s assault on his pregnant 15-year-old girlfriend—blaming the girlfriend for angering I. and causing the beating—showed Mother's tendency to deflect responsibility, and also called into question her ability to put into effect the domestic violence counseling she completed.

¶9        Mother indicated to the psychologist that she was satisfied with the way she parented her children, even though parent-aide reports noted concerns that Mother failed to adequately supervise the children (in particular leaving M.T. in dangerous circumstances).  The psychologist suggested that Mother's lack of insight created a concern that, if J.T., Y.T., and M.T. were returned to Mother's care, they would be left unprotected and unsupervised and would follow in their older siblings' footsteps.  The

psychologist opined that DCS had offered appropriate services, but that Mother had nevertheless been unable to correct the parenting concerns.

¶10        The best interests assessment suggested that the children would benefit from severance. The psychologist who conducted the assessment noted that the children had some level of attachment to Mother, but that it was an anxious attachment rather than a normal or healthy one. The psychologist concluded that Mother's relationship with her children was "more as a peer than as a parent," and with Y.T. in particular had created an unhealthy role-reversal. Y.T. had adopted a parental role with the younger children, and even sought to protect and care for Mother, which the psychologist noted could deprive Y.T. of necessary stages of childhood development. In light of Y.T.'s unhealthy bond with Mother, the psychologist opined that severance was in Y.T.'s best interests, and that Y.T. would benefit from individual therapy to address her issues with Mother. The psychologist also expressed a concern that because of Mother's lack of supervision and her inability to nurture the children, Mother would be unable to handle J.T.'s ADHD and that M.T. would be at risk if they were returned to Mother's care. The psychologist thus concluded that severance would be in the children's best interests.

¶11        Father has been in custody since November 15, 2011, 20 days after the children were removed, when he was arrested for burglary, and has since been convicted of burglary and related counts and sentenced to a 14-year term of imprisonment, with an anticipated release in 2025. Although Father was aware at the time that the children had been removed from Mother's care, he did not contact DCS prior to his arrest. DCS later located Father in jail and provided him with his case manager's name and with information on how to contact DCS.

¶12        Over the course of the dependency, Father never provided gifts or support for the children. He sent letters or drawings to the children only "a couple times." Father did not see the children after their removal, nor did he request visitation through DCS or through the court. Father testified that he had talked to the children on the phone by calling Mother during her visitation. Although Father claimed to have had telephonic contact once or twice weekly for a few months in 2013, parent-aide notes reflect that Father called only twice.

¶13        In October 2013, DCS moved to terminate both Mother's and Father's parental rights to J.T., Y.T., and M.T., alleging grounds of 15 months' time in care and mental illness as to Mother and abandonment

and 15 months' time in care as to Father. After a two-day evidentiary hearing, the superior court found that DCS had established grounds for severance and that severance of each parent's rights would be in the children's best interests and, accordingly, terminated Mother's and Father's parental rights to all three children.

¶14 Both Mother and Father timely appealed from the court's severance order. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") § 8-235.[1]

**DISCUSSION**

¶15 The superior court may terminate the parent–child relationship if clear and convincing evidence establishes at least one statutory ground for severance and if a preponderance of the evidence shows severance to be in the child's best interests. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22, 110 P.3d 1013, 1018 (2005). We review the superior court's severance ruling for an abuse of discretion, accepting the court's factual findings unless clearly erroneous and viewing the evidence in the light most favorable to sustaining the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004); *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2, 181 P.3d 1126, 1128 (App. 2008). We similarly defer to the superior court's credibility judgments. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4, 53 P.3d 203, 205 (App. 2002).

**I. Termination of Mother's Parental Rights.**

¶16 First, Mother argues that the superior court violated her right to due process by denying her request to call M. as a witness. She also argues that the court erred by restricting her cross-examination of other witnesses regarding M. We review the superior court's evidentiary rulings for an abuse of discretion. *Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, 42, ¶ 11, 178 P.3d 511, 514 (App. 2008). We review de novo constitutional claims and other issues of law. *See State v. McGill*, 213 Ariz. 147, 157–58, ¶ 45, 140 P.3d 930, 940–41 (2006); *Dep't of Child Safety v. Beene*, 235 Ariz. 300, 304, ¶ 8, 332 P.3d 47, 51 (App. 2014).

¶17 On the first day of the severance hearing, Mother requested permission to call M. and two other people as witnesses. The court denied

---

[1]    Absent material revisions after the relevant date, we cite a statute's current version.

the request because the proposed witnesses had not been timely disclosed. As to M. specifically, the court also noted he was a juvenile who had previously been subject to the dependency, and found it would not be in M.'s best interests to testify.

¶18          Although Mother asserts that information regarding M. was "key" to the severance ruling, as outlined above, discussion of M. was collateral to direct evidence of Mother's relationship with and parenting of the younger children. Moreover, discussion of M. focused not on M.'s statements, but on Mother's actions in parenting him (for example, her failure to enroll him in high school), about which Mother and other witnesses were competent to testify. To the extent one witness mentioned a single hearsay statement from M.—a note that M. once described himself as a pimp in front of the younger children—Mother has not met her burden to show that admission of that single statement, particularly in the context of the evidence unrelated to M. outlined above, rendered the proceeding unfair. *See Beene*, 235 Ariz. at 304, ¶ 8, 332 P.3d at 51.

¶19          Mother's argument that the superior court improperly restricted her cross-examination is similarly unavailing. The court sustained on grounds of relevancy only one objection to a single question posed by Mother's counsel to the case manager: "In [M.'s] case, you've had a lot of testimony about your concerns about your belief [M.]'s not in school. Is that a reason to have him removed from his mother's custody?" The court correctly found that whether there existed grounds to remove M. from Mother's care, when M. was no longer subject to the dependency and was not a subject of the severance motion, was irrelevant to the issue of terminating Mother's rights to the younger children. In contrast, and as the court noted, M.'s situation was relevant in the context of Mother's actions, her ability to parent, supervise, and control children as they become teenagers, and Mother's counsel in fact elicited substantial testimony about this from several witnesses. Accordingly, the superior court did not err in its treatment of evidence related to M.

¶20          Next, Mother disputes the superior court's finding that severance was warranted on the ground of 15 months' time in care. The superior court may terminate a parent's rights based on the child's time in care under A.R.S. § 8-533(B)(8)(c) if: (1) the child has been in an out-of-home placement for at least 15 months, (2) "[DCS] has made a diligent effort to provide appropriate reunification services," (3) "the parent has been unable to remedy the circumstances" necessitating the out-of-home placement, and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control

in the near future." The relevant circumstances are those existing at the time of severance. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96 n.14, ¶ 31, 219 P.3d 296, 306 n.14 (App. 2009).

¶21 Mother does not dispute that J.T., Y.T., and M.T. have been in care for over 15 months or that DCS provided appropriate services. Instead, she contends that because she made good faith efforts to comply with the reunification services, the court erred by finding her unable to remedy the circumstances causing out-of-home placement. Mother's argument conflates two distinct grounds for termination: nine months' and 15 months' time in care. Severance based on nine months' time in care requires proof that a parent has "substantially neglected or willfully refused to remedy the circumstances" causing out-of-home placement. A.R.S. § 8-533(B)(8)(a). Because this test focuses on a parent's efforts, *see Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 329, ¶ 20, 152 P.3d 1209, 1212 (App. 2007), good faith efforts to comply with reunification services weigh heavily against severance on the nine months' ground. *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 576, 869 P.2d 1224, 1229 (App. 1994).

¶22 In contrast, the 15 months' time in care ground (the relevant basis for termination in this case) focuses not just on a parent's efforts to remedy the circumstances necessitating an out-of-home placement, but rather on a "parent's success in actually doing so." *Marina P.*, 214 Ariz. at 329–30, ¶¶ 20–21, 152 P.3d at 1212–13. Here, although Mother participated in all services offered, and even successfully remedied her substance abuse issue, she nevertheless was unable to provide adequate supervision or a safe and appropriate home for J.T., Y.T., and M.T. The evidence summarized above—including M.T.'s unexplained injury, exposure of M.T. and J.T. to dangerous situations even during supervised visitation, and the uncorrected role-reversal with Y.T.—supports the superior court's finding that Mother has not been able to acquire the skills necessary to provide a safe home.

¶23 Moreover, substantial evidence supports the conclusion that Mother will likely remain unable to exercise appropriate parental care and control in the near future. Despite three years of parent-aide services, Mother remained unwilling or unable to modify her parenting style to provide a safe and constructive environment for the children. When DCS facilitated supervised visits, Mother continually failed to adequately supervise the children, instead yelling from the couch or relying on Y.T. to redirect the younger children. The psychologist suggested a poor prospect for future improvement given Mother's tendency to avoid taking

personal responsibility and her artificially inflated self-assessment, which left her either unwilling or unable to acquire the necessary parenting skills.

¶24 The superior court's finding regarding the 15 months' time in care ground for severance is thus supported by the evidence and establishes a basis for termination of Mother's parental rights. Because the court properly found this ground for severance, we need not address the alternative mental illness ground. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27, 995 P.2d 682, 687 (2000).

¶25 Finally, Mother argues that, because she is bonded to the children, the superior court erred by finding severance to be in the children's best interests. In considering best interests, the court must determine "how the child would benefit from a severance *or* be harmed by the continuation of the relationship" with the biological parent. *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990). Evidence that the child is adoptable or of a current adoptive plan may support a finding that termination is in the child's best interests, as may evidence that the current placement is meeting the child's needs. *Lawrence R. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 585, 587, ¶ 8, 177 P.3d 327, 329 (App. 2008); *Mary Lou C.*, 207 Ariz. at 50, ¶ 19, 83 P.3d at 50.

¶26 Mother asserts the evidence showed that she was bonded to J.T., Y.T., and M.T. and that no evidence showed any detriment to the children should her parental relationship with them continue. She argues that the evidence in fact suggested that terminating her parental rights would harm the children. The psychologist testified, however, that Mother's bond to the children was an anxious attachment rather than a healthy bond. And the evidence showed that severance would benefit Y.T. by removing the inappropriate role-reversal with Mother, allowing Y.T. a more normal childhood development. Similarly, severance would allow the children a stable, well-supervised, and nurturing home, which Mother had been unable to provide. Additionally, the children's current placement is able to meet their needs, including J.T.'s special needs, and all three children are adoptable. Accordingly, the superior court did not err by finding severance to be in the children's best interests, and we therefore affirm the termination of Mother's parental rights as to J.T., Y.T., and M.T.

## II.      Termination of Father's Parental Rights.

**¶27**      Father argues the superior court erred by finding the statutory ground of abandonment; he does not dispute the court's best interests findings.

**¶28**      Under A.R.S. § 8-533(B)(1), the superior court is authorized to terminate a parent's rights upon a finding "[t]hat the parent has abandoned the child."  For these purposes, "abandonment" is

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision.  Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child.  Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1).

**¶29**      The abandonment analysis is based on an objective measure of the parent's conduct, not the parent's subjective intent.  *Michael J.*, 196 Ariz. at 249–50, ¶ 18, 995 P.2d at 685–86; *see also Anonymous v. Anonymous*, 25 Ariz. App. 10, 12, 540 P.2d 741, 743 (1975).  The key consideration is whether the parent, under the unique circumstances of the case, "has provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship."  *Michael J.*, 196 Ariz. at 249–50, ¶¶ 18, 20, 995 P.2d at 685–86; A.R.S. § 8-531(1).

**¶30**      Here, Father agrees that he was aware when J.T., Y.T., and M.T. were removed by DCS in October 2011.  Although Father claims he never received a service letter from DCS, the case manager testified that Father was informed of the identity of his case manager and how to contact DCS, and Father himself referred to the ongoing case manager by name while testifying.  Even after being served with the dependency, Father did not contact DCS or the court to try to establish visitation or other means of contact with the children.  Father did not send gifts to the children or provide financial support.  His only contacts with the children during the dependency were two letters or drawings and two phone calls.  The record amply supports the superior court's finding that these were only "minimal attempts" to communicate with the children over the two

and one-half years after removal and, accordingly, that severance was warranted on grounds of abandonment.

¶31            Citing *Calvin B. v. Brittany B.*, 232 Ariz. 292, 304 P.3d 1115 (App. 2013), Father argues that DCS improperly stopped his telephonic contact with the children in October 2013, thereby interfering with his communication with the children and artificially creating the circumstances of abandonment. In *Calvin B.*, we held that "a parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child." *Id.* at 293–94, ¶ 1, 304 P.3d at 1116–17; *see also Michael J.*, 196 Ariz. at 251, ¶ 25, 995 P.2d at 687 (noting that DCS "may not unduly interfere with" parent–child relationship and still terminate parental rights based on abandonment) (citation omitted). There, the mother repeatedly—over the course of years—blocked the father's continual, substantial efforts to communicate with his child despite the roadblocks created by the mother. *See Calvin B.*, 232 Ariz. at 294–95, 297, ¶¶ 2–8, 22–24, 304 P.3d at 1118–19, 1120 (describing how, in the wake of a dissolution decree allowing father "liberal visitation" and a later order establishing fixed parenting time, mother allowed contact for only minutes at a time, then sought two orders of protection, ignored father's requests for visits, and contacted police to prevent visits; father persistently requested visits, and even sought and received a court order for parenting time, which the mother violated by refusing contact).

¶32            Father's minimal efforts in this case are a far cry from the persistent efforts to establish communication in *Calvin B.* Here, the only alleged restriction on Father's ability to communicate with his children is his claim that in October 2013, DCS stopped his phone calls through Mother to the children. We note that neither the parent-aide notes nor DCS's progress reports to the court mention any such restriction on Father's communication with the children. In any event, Father does not address his failure to act in the two years between removal and the alleged restriction, sending only two letters and making at most a few phone calls. Moreover, after October 2013, Father made no effort to contact DCS to reestablish communication, either directly or through his attorney, and he did not ask the court to allow communication during the two hearings at which he appeared prior to the severance trial. As our supreme court has noted, although DCS "may not unduly interfere with" a parent's efforts to create or maintain a relationship with a dependent child, "[t]he burden to act as a parent rests with the parent, who should

assert his legal rights at the first and every opportunity." *Michael J.*, 196 Ariz. at 251, ¶ 25, 995 P.2d at 687 (citation omitted). Father failed to do so.

¶33 Because Father made only minimal efforts to communicate with the children, we affirm the superior court's order severing his parental rights as to J.T., Y.T., and M.T. on grounds of abandonment. Because we affirm on this ground, we need not address the alternative ground of 15 months' time in care. *See Michael J.*, 196 Ariz. at 251, ¶ 27, 995 P.2d at 687.

## CONCLUSION

¶34 For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: gsh