NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

OVAHL LESEAN DEES, *Appellant*.

No. 1 CA-CR 15-0226
FILED 6-21-2016

---

Appeal from the Superior Court in Maricopa County
No. CR2014-120415-001
The Honorable Erin Otis, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Terry Reid
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Andrew W. Gould delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Randall M. Howe joined.

---

**G O U L D**, Judge:

¶1        Ovahl Lesean Dees appeals his convictions and sentences for one count of unlawful imprisonment and one count of threatening or intimidating.  For the reasons that follow, we affirm.

## BACKGROUND[1]

¶2        On the morning of April 30, 2014, a postal worker was delivering mail to a large residential complex when she encountered the victim, who inquired how long it would be before the worker reached her boyfriend's mailbox.  The victim's boyfriend, Dees, had lost his mail key, and the victim asked to meet the postal worker at the mailbox and accept hand-delivery of Dees' mail.

¶3        When the postal worker arrived at Dees' mailbox, however, the victim was not there, so the worker opted to hand-deliver Dees' mail to his front door.  When she rang Dees' doorbell, no one answered.  She rang again and knocked.  As Dees was opening the front door, the postal worker heard a female voice, in a "loud whisper," say "ma'am, ma'am."  The worker stepped back in an attempt to locate the source of the whisper and saw the victim climbing over the second-story balcony.  The victim attempted to "shimmy down" but dropped during her descent.  Initially she landed on her feet, but then fell and appeared hurt.

¶4        Upon seeing the victim fall, Dees quickly moved past the postal worker toward the victim.  The victim looked upset and "started scooting away" while saying "Get away from me.  I don't want anything to do with you."  After getting to her feet, the victim began quickly walking away.  At first, Dees followed the victim, but he then returned, took the mail from the postal worker, and entered his townhouse.

---

[1]        We view the trial evidence in the light most favorable to sustaining the jury's verdicts.  *State v. Nelson*, 214 Ariz. 196, 196, ¶ 2 (App. 2007).

¶5 Meanwhile, four police officers (Detectives Stadler, McKnight, Monnens, and Sergeant Scantlebury) and one probation officer (Officer Leroy) were stationed in unmarked vehicles near Dees' townhouse, waiting to serve him with a probation warrant. Detectives Stadler and McKnight were parked on the north side of Dees' residence and the others were positioned on the south side. They had been sitting outside the townhouse for approximately fifteen minutes when Detective Stadler saw the victim fall from the second-story balcony of the townhome. Detective Stadler then watched Dees emerge from his townhouse and appear to offer the victim help, but the victim backed away. When the victim stood, she started to quickly walk away from Dees and he grabbed her. Eventually, the victim broke free of his grip and started running.

¶6 At that point, Detective Stadler radioed the other vehicle and alerted those officers of the situation. Detective Monnens ran toward Dees' townhouse and, as he approached Dees' residence, he saw Dees retrieve a bicycle and begin pedaling away. Detective Monnens identified himself as a police officer and ordered Dees to stop. In response, Dees turned and looked at the detective, but began pedaling away faster. Detective Stadler then picked up Detective Monnens and they pursued Dees by vehicle. By the time the detectives caught up with Dees, however, both he and the victim had been detained by Sergeant Scantlebury and Detective McKnight.

¶7 The police officers separated Dees and the victim, and then handcuffed the victim. Detective Monnens spoke with the victim, who said she and Dees had an argument on the phone while she was running errands that morning, and she had hung up on him. When she later returned to the townhouse, Dees was angry that she had "disrespected" him by abruptly hanging up. The victim then told Dees that she wanted to leave, but he told her that she was not leaving the townhome and blocked her way to the front door. The victim said Dees told her he would "bust her kneecaps" if she tried to leave. After the victim jumped from the balcony, Dees grabbed her, but she managed to break free.

¶8 At that point, Detective Monnens removed the victim's handcuffs and inquired about a foot bandage she was wearing. The victim explained she had sustained an injury two weeks earlier when she had previously jumped off the balcony to get away from Dees.

¶9 The State charged Dees with one count of unlawful imprisonment and one count of threatening or intimidating. The State also alleged numerous historical prior felonies, aggravating circumstances, and that Dees committed these crimes while on probation.

¶10            At trial, the victim testified that she was in a continuing relationship with Dees and did not want him "to get in trouble."  She also acknowledged that she had spoken to Dees numerous times about the case and they had reviewed the police reports together.  She then explained that on the morning of April 30, 2014, she ran some errands on a bicycle.  Dees called her and she eventually hung up because it was difficult to hold the phone and maneuver the bicycle at the same time.  When she returned to the residential complex, she spoke briefly with the postal worker about the mail and then returned to Dees' townhouse.  Dees was a "little upset" and believed the victim had "disrespected" him by hanging up.  The victim responded that she was running late for work, did not have time to talk about it, and needed to leave.  The victim testified that Dees never touched her, threatened her, blocked her exit, or told her she could not leave.

¶11            The victim further testified that when the postal worker came to the front door, the victim called out to her, but only "to signal her to stop her from leaving."  The victim then decided to leave the townhouse via the second-story balcony to prevent further "delay."  At the time, she believed it was easier to jump off the balcony than end the argument with Dees.  After she fell, Dees tried to help her, but the victim was upset and told him she did not want to see him again and would not come back.  The victim then quickly walked toward the bus stop and was eventually detained by police officers.

¶12            Notwithstanding her trial testimony, the victim admitted that she had told Detective Monnens that Dees had prevented her from leaving the townhouse.  She also acknowledged telling Detective Monnens that Dees had said "good luck getting to work with busted knee caps," but explained the detective incorrectly interpreted this "joke" as a threat.  On cross-examination, the victim stated she did not consider herself a victim and expressed her belief that the seriousness of the statements and situation had been greatly exaggerated.

¶13            After a seven-day trial, a jury found Dees guilty as charged.  The jury also found two aggravating circumstances: (1) the offenses involved the infliction or threatened infliction of serious physical injury, and (2) Dees was on probation at the time of the offenses.  After finding that the State had proven seven prior felony convictions, the trial court sentenced Dees to an aggravated term of four and one-half years' imprisonment for the count of unlawful imprisonment, to be served consecutively to his sentence in an unrelated probation violation case (CR 2012-148615-001DT), and a six months' term for the count of threatening or intimidating.  Dees timely appealed.  We have jurisdiction pursuant to

Arizona Revised Statutes sections 12-120.21(A)(1) (2003), 13-4031, and -4033(A)(1) (2010).

## DISCUSSION

I.     Preclusion of Specific Act Evidence

**¶14**      Dees contends the trial court violated his constitutional right to confront witnesses and present a defense by precluding evidence that the victim possessed stolen checks at the time police officers detained her. Specifically, Dees asserts that the victim was "motiv[ated] to lie" to police officers and portray herself as a victim because she feared prosecution for her own criminal conduct.

**¶15**      Evidentiary rulings are generally reviewed for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006). "Evidentiary rulings that implicate the Confrontation Clause, however, are reviewed de novo." *Id.*

**¶16**      When police officers detained the victim on April 30, 2014, she was carrying a backpack with six checks she had taken from her mother without permission. After interviewing the victim about the events of that morning, Detective Monnens removed her handcuffs and asked to search her backpack. The victim consented to the search and, after detectives found the checks, she told them that she had taken them from her mother and had made two of the checks payable to herself. Subsequent to these admissions, Detective Monnens began an investigation of the matter and contacted the victim's mother, who told him that the bank account had been closed for some time and she did not wish to prosecute. The State declined to file charges on that basis.

**¶17**      Before trial, Dees filed a motion to appoint counsel for the victim, asserting she may "incriminate herself regarding potential theft and forgery charges"; the court granted the request. Soon thereafter, the State moved in limine to preclude Dees from using evidence regarding the victim's possession of the checks to impeach her, arguing that such evidence was both irrelevant and unduly prejudicial. Dees responded that he had the right to confront and cross-examine the victim regarding the checks because the evidence was relevant to show her motive to lie when she was first detained by the officers. After hearing oral argument from the parties, the trial court precluded the evidence.

**¶18**      A defendant's right under the Confrontation Clause to cross-examine witnesses about their motives or biases is not absolute. *Delaware*

*v. Van Arsdall*, 475 U.S. 673, 679 (1986). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*) (emphasis in original). Thus, trial judges have wide discretion in imposing limits on such cross-examination based on concerns about prejudice, confusion of the issues, and relevance. *Van Arsdall*, 475 U.S. at 679; *see State v. Dickens*, 187 Ariz. 1, 14 (1996) (citing *State v. Oliver*, 158 Ariz. 22, 30 (1988)) (stating a court does not violate a defendant's confrontation rights by limiting cross-examination to "matters admissible under ordinary evidentiary rules, including relevance").

**¶19**       Relevant evidence is admissible unless it is otherwise precluded by the federal or state constitution, an applicable statute, or rule. Ariz. R. Evid. 402. Evidence is relevant if it has "any tendency" to make a fact of consequence in determining the action "more or less probable than it would be without the evidence[.]" Ariz. R. Evid. 401. Relevant evidence may be excluded, however, if its probative value "is substantially outweighed" by a danger of unfair prejudice. Ariz. R. Evid. 403.

**¶20**       Subject to the limitations of Rule 403, specific instances of a witness's conduct, if probative of truthfulness or untruthfulness, may be explored during cross-examination. Ariz. R. Evid. 608(b); *State v. Woods*, 141 Ariz. 446, 450 (1984) (explaining a trial court has substantial discretion to allow cross-examination of a witness about specific acts of misconduct, but the utility of the evidence must be weighed against the possibility of prejudice under Rule 403); *see also State v. Murray*, 184 Ariz. 9, 30 (1995). When acts of untruthfulness "are wholly unrelated to the matter in issue," however, "the evidence may be, in the discretion of the court, properly excluded under Rules 608(b) and 403." *State v. Oliver*, 158 Ariz. 22, 31 (1988) (applying Rule 608(b)); *see also State v. Cook*, 151 Ariz. 205, 206 (1986) (explaining trial courts have the discretion to exclude "acts of mendacity wholly unrelated to the instant situation").

**¶21**       In this case, the trial court ruled that the subject evidence was inadmissible because the "probative value" of the evidence as to the victim's purported motive to lie was "essentially nonexistent." The court noted that Dees' argument was premised on an illogical theory; the victim lied to inculpate Dees in various crimes under the belief that it would protect her from possible prosecution for her undetected crimes, yet when Detective Monnens asked whether he could search her backpack, she not only consented but volunteered that she had stolen checks from her mother, with no attempt to fabricate an alternative story. The court also stated that

the minimal probative value of the evidence was substantially outweighed by the danger of undue prejudice; specifically, the evidence would confuse the jury and waste the jury's time on a collateral matter.

¶22        Finally, the record shows that a substantial amount of evidence was available to Dees to impeach the victim's statements to the police. As an initial matter, the victim recanted all of her inculpatory statements to the police at trial. Additionally, she testified that the police greatly exaggerated her statements and took them out of context.

¶23        Dees argues, however, that the impeachment evidence should have been admitted because defense counsel are afforded great latitude in examining a witness's motive to lie on behalf of the State. In support of this argument, Dees cites several cases involving witnesses who received favorable treatment from the State in exchange for cooperation, or who, at the time statements were made or testimony was given, were otherwise vulnerable to the pressure of possible prosecution or confinement. *See, e.g.,* *Davis v. Alaska*, 415 U.S. 308, 317-18 (1974) (concluding trial court erroneously excluded evidence that a key witness was on probation and therefore particularly "vulnerable" to "undue pressure" from the state); *State v. Melendez*, 121 Ariz. 1, 3-4 (1978) (concluding trial court erroneously precluded defense from attacking the credibility of a key witness by showing that through "his testimony he was escaping the possibility of a penalty of death or life imprisonment"); *State v. Little*, 87 Ariz. 295, 300-01 (1960) (concluding trial court erroneously precluded evidence that the chief prosecution witness had committed crimes and "that prosecution officials, knowing that fact, were doing nothing about it in order to induce the witness to testify in favor of the State").

¶24        The cases cited by Dees are distinguishable from this case. Here, the State did not, in exchange for the victim's testimony, make an offer of leniency or offer to dismiss charges related to the stolen checks. To the contrary, the record reflects that Detective Monnens investigated the checks, but no charges were filed because the victim in that case informed the detective she did not wish to have the case prosecuted.

II.        Admission of Officer Leroy's Testimony

¶25        Dees argues the trial court erred by admitting Officer Leroy's testimony regarding Dees' probation status at the trial on aggravating factors. Specifically, Dees asserts Officer Leroy's testimony was hearsay and lacked adequate foundation.

¶26 At the aggravating factors trial, Officer Leroy testified that he is a probation surveillance officer and his duties primarily involve serving warrants on probationers. On April 30, 2014, Officer Leroy was tasked with serving a warrant on Dees. Officer Leroy explained that, given the nature of his position, he never serves warrants on non-probationers. The prosecutor then asked Officer Leroy whether Dees was on probation as of April 30, 2014, and defense counsel objected for lack of foundation. After the trial court sustained the objection Officer Leroy testified he had received Dees' probation file from Dees' assigned probation officer, Tony Premack, after the warrant was issued. The State then offered as an exhibit a sentencing minute entry demonstrating that Dees was placed on a three-year term of probation in CR 2012-148615-001DT that commenced on January 30, 2014, approximately three months before the incident giving rise to the current case. The defense again objected to Officer Leroy's testimony about Dees' probation status, arguing he lacked "any firsthand knowledge[.]" The trial court overruled the objection, finding "no admissibility issue," and advised defense counsel that she could "attack the weight" of the evidence.

¶27 On cross-examination, Officer Leroy acknowledged that he was not Dees' assigned probation officer and had no personal knowledge of Dees' alleged probation violations underlying the warrant. He also agreed that his testimony was based on the documents he had read from Dees' file and noted that Dees had denied being on probation when he was taken into custody. Drawing on this testimony, defense counsel argued to the jury that the State had failed to meet its burden of proving Dees was on probation at the time of the offenses, explaining probation can be "terminated early" and the State had not presented the testimony of Dees' assigned probation officer to confirm Dees was on probation at the time of the offenses.

¶28 Generally, out-of-court statements in a police report are hearsay and inadmissible absent a qualifying exception. Ariz. R. Evid. 801(c), 802; *State v. Smith*, 215 Ariz. 221, 229, ¶ 28 (2007); *see also Ritchie v. Krasner*, 221 Ariz. 288, 302, ¶ 45 (App. 2009) (explaining police reports properly excluded as hearsay).[2] As a corollary, a witness's "hearsay

_____

[2] Citing *State v. McGill*, 213 Ariz. 147, 159, ¶ 52 (2006), the State argues that the Confrontation Clause and rules of evidence do not apply to a trial on aggravators. In *McGill*, the supreme court held that the Confrontation Clause does not apply to mitigation rebuttal testimony at a sentencing hearing. *Id*. The supreme court clearly distinguished, however, "between

recollections" of a written report are equivalent to offering the report into evidence and are therefore inadmissible. *State v. Seymour*, 21 Ariz. App. 144, 146 (1973).

**¶29** In this case, Officer Leroy's testimony that he serves warrants only on probationers was neither hearsay nor lacking in foundation. Likewise, insofar as Officer Leroy's testimony that Dees was on probation was a logical inference, based on his personal experience of serving warrants only on probationers, it was not hearsay or lacking in foundation. However, Officer Leroy's testimony that Dees was on probation may have been based, at least in part, on statements in the probation file, and was therefore inadmissible.

**¶30** The improper admission of hearsay evidence constitutes harmless error if it is evident from the record that the evidence had "no impact" on the jury's verdict. *State v. Bass*, 198 Ariz. 571, 582, ¶ 45 (2000). To satisfy this standard, the record must contain "a body of proof, firmly convincing on the essential facts," such that the jury would have convicted even without the error. *Id.*

**¶31** Here, the State introduced a sentencing minute entry that reflects Dees was sentenced to a three-year term of probation three months before the current offenses occurred. Although defense counsel argued that Dees *may* have been released early from this sentence, the record does not support such a claim. Indeed, other than Dees' self-serving statement to arresting officers that he was not on probation when he was taken into custody, the uncontroverted evidence shows that Dees had thirty-three months remaining on his term of probation at the time of the current offenses. Given these facts, the evidence was "firmly convincing" such that even absent Officer Leroy's hearsay testimony, the jury would have found the aggravating factor. Therefore, to the extent Officer Leroy relied on out-of-court statements in testifying that Dees was a probationer, the admission of such testimony was harmless error.

---

hearsay used to establish an aggravating factor, to which the Confrontation Clause applies, and hearsay used to rebut mitigation, to which the Confrontation Clause does not apply." *Id.* at 51; *see also State v. Johnson*, 212 Ariz. 425, 433, ¶ 25 (2006) (explaining the "rules of evidence govern the admissibility of information relevant to . . . aggravating circumstances"). Because the testimony at issue relates to proof of an aggravating factor, the State's reliance on *McGill* is misplaced.

## CONCLUSION

¶32        Dees' convictions and sentences are affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: AA